IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-247

Filed 7 January 2026

Vance County, No. 17CR051427-900

STATE OF NORTH CAROLINA

    v.

JARRED ROBERT OAKES

  Appeal by Defendant from judgment entered 1 February 2024 by Judge Cynthia King Sturges in Vance County Superior Court. Heard in the Court of Appeals 23 September 2025.

> *Attorney General Jeff Jackson, by Special Deputy Attorney General Marc Bernstein, for the State-Appellee.*
>
> *Center for Death Penalty Litigation, by Janine Fodor, for Defendant-Appellant.*

  COLLINS, Judge.

  Defendant Jarred Robert Oakes appeals from a judgment entered upon a jury's guilty verdict of first-degree murder. Defendant argues that the trial court erred by preventing him from presenting defenses of diminished capacity and insanity, preventing him from receiving effective assistance of counsel, adopting a forensic psychiatrist's evaluation of Defendant at a competency hearing, failing to conduct a sua sponte competency hearing at the beginning of trial, and admitting an unauthenticated voicemail into evidence. For the following reasons, we find no error.

## I.    Background

Defendant was charged with first-degree murder for the strangulation of his mother, Geraldine Oakes, which occurred on 24 May 2017.

Defendant has been diagnosed with schizophrenia, and in the five years leading up to trial, Defendant twice lost and regained the capacity to stand trial. In May 2023, the trial court ordered that Defendant remain in the hospital until trial to receive medication and mental health treatment.

At a pre-trial hearing in October 2023, defense counsel indicated that he intended to pursue defenses of diminished capacity and insanity but needed to review the latest report on Defendant's mental health and had not discussed the issue with Defendant. The trial court conducted the following colloquy with Defendant regarding his consent to presenting these defenses:

> THE COURT: Thank you, Mr. Oakes. Do you consent for when your case comes to trial for [defense counsel], because here is – this is the rule. If you don't consent to your attorney's trial strategy, he has to obey your wishes. So if you wish – if you do not wish for him to argue at trial that at the time of the offense you had diminished capacity or – I'm not saying – He cannot do that without your consent. He must obey your wishes.
>
> THE DEFENDANT: I didn't do anything to leave anybody under the impression that I had something wrong with my mind. I tried to do my best at all times, so whatever I put forth effort to do, everything is perfectly fine for my strength – I mean for my willpower.
>
> . . . .

THE COURT: Are you good with [defense counsel] arguing to the jury that you were maybe not in your right mind 2017?

THE DEFENDANT: I didn't hear what you said.

THE COURT: Are you – Do you agree, or are you okay with any sort of argument or defense presented to this jury that indicates that you were not in your right mind in 2017 when you –

THE DEFENDANT: I'm not in agreeance with that, no, ma'am.

THE COURT: Sir?

THE DEFENDANT: I'm not in agreeance with it. I'm definitely not in agreeance at all.

THE COURT: You are opposed.

THE DEFENDANT: I've been mentally capable of being to proceed the entire time. There's been type of misunderstanding.

. . . .

THE DEFENDANT: No. No, I've never claimed to be not – not be in my correct mind.

THE COURT: Do you disagree or do you consent with Mr. Gardner arguing that to the jury?

THE DEFENDANT: I would hope he wouldn't be arguing that I wasn't mentally capable.

THE COURT: I just need to get – I really need more of a yes or no.

THE DEFENDANT: No. I wouldn't.

THE COURT: Thank you. Thank you. Mr. Oakes.

THE DEFENDANT: Yes ma'am.

As a result of the colloquy, the trial court concluded that Defendant did not consent to defense counsel presenting diminished capacity or insanity defenses and prohibited defense counsel from doing so. Defense counsel did not object to the trial

court's ruling.

The case came on for trial on 29 January 2024 where the State's evidence tended to show the following. Geraldine and Defendant's father, Robert, were married and had three children — Defendant, Will, and Kaitlin. Kaitlin lived with her parents in Youngsville, Franklin County. Defendant lived in a mobile home beside his parents' house. Robert and Geraldine also owned a house on Kerr Lake in Henderson, Vance County.

On the morning of 24 May 2017, Geraldine drove to the lake house to clean it before Memorial Day weekend. After she arrived, she texted Robert that Defendant was there. Robert finished up some work and then headed to the lake house.

At 12:54 p.m., a voicemail was sent from Geraldine's phone to Kaitlin's phone. Kaitlin was in her last class of the day at school, where she listened to the voicemail. It seemed to her to be an accidental dial, but she recognized her mother's and Defendant's voices arguing. The following dialogue can be heard on the voicemail recording:

> GERALDINE: [Unintelligible]
> DEFENDANT: You know why you come up here today?
> GERALDINE: [Unintelligible]
> DEFENDANT: To die. Get the fuck out of my face.
> GERALDINE: Jarred you got problems.
> DEFENDANT: What did I just say, bitch?

After hearing the voicemail, Kaitlin called her mother, who did not answer.

She then called her father, who was on his way to the lake house, and told him that she had received a voicemail from her mother. Kaitlin said that on the voicemail she heard her mother and Defendant arguing, "it sounded really bad," and Defendant was threatening Geraldine.

A recording of the voicemail was admitted as State's Exhibit 6. Kaitlin testified that the voices on the voicemail belonged to her mother and Defendant, and that she received the voicemail from her mother's phone number.

When Robert arrived at the lake house, Geraldine's truck was there. Robert encountered Defendant in the driveway, and they had a conversation. When Robert asked where Geraldine was, Defendant responded, "You ain't got to worry about her. I done took care of her. She's dead."

Robert went into the house and found Geraldine in her bedroom with a rope tightly wrapped around her neck several times. Her face was purple. Robert recognized the rope as one that he had placed on his boat that was at the lake property. Robert called 9-1-1 and explained that his wife was dead, and he thought his son had killed her. He was instructed to lock the doors and begin chest compressions, which he did until first responders and police arrived.

A "be on the lookout" alert was issued for Defendant; he was stopped and arrested in Youngsville shortly thereafter. On 1 February 2024, the jury convicted Defendant of first-degree murder, and the trial court sentenced Defendant to life imprisonment without the possibility of parole. Defendant appeals.

## II.  Discussion

Defendant argues that the trial court erred by preventing him from presenting defenses of diminished capacity and insanity, preventing him from receiving effective assistance of counsel, adopting a forensic psychiatrist's evaluation of Defendant at a competency hearing, failing to conduct a sua sponte competency hearing at the beginning of trial, and admitting an unauthenticated voicemail into evidence.  We address each argument in turn.

## A. Diminished Capacity and Insanity

Defendant first contends that he was denied his constitutional right, under the Due Process Clause of the Fourteenth Amendment and the Compulsory Process and Confrontation Clauses of the Sixth Amendment, to a meaningful opportunity to present a complete defense.  Defendant specifically argues that he did not knowingly and intelligently waive his right to present the defenses of diminished capacity and insanity.

Defendant has failed to preserve this issue for appellate review.  "In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context."  N.C. R. App. P. 10(a)(1).  "It is also necessary for the complaining party to obtain a ruling upon the party's request, objection, or motion."  *Id.*  Further, "[c]onstitutional issues not raised and passed upon at trial will not be considered for

the first time on appeal" by this Court. *State v. Lloyd*, 354 N.C. 76, 86-87 (2001).

At the October 2023 pretrial hearing, the trial court conducted a colloquy with Defendant where the following exchange took place:

> THE COURT: Are you – Do you agree, or are you okay with any sort of argument or defense presented to this jury that indicates that you were not in your right mind in 2017 when you –
>
> THE DEFENDANT: I'm not in agreeance with that, no, ma'am.
>
> THE COURT: Sir?
>
> THE DEFENDANT: I'm not in agreeance with it. I'm definitely not in agreeance at all.
>
> THE COURT: You are opposed.
>
> THE DEFENDANT: I've been mentally capable of being to proceed the entire time. There's been type of misunderstanding.
>
> . . . .
>
> THE DEFENDANT: No. No, I've never claimed to be not – not be in my correct mind.
>
> THE COURT: Do you disagree or do you consent with Mr. Gardner arguing that to the jury?
>
> THE DEFENDANT: I would hope he wouldn't be arguing that I wasn't mentally capable.
>
> THE COURT: I just need to get – I really need more of a yes or no.
>
> THE DEFENDANT: No. I wouldn't.

Following this, the trial court prohibited defense counsel from presenting defenses of "diminished capacity or anything else" to the jury. Defense counsel did not object to the trial court's decision or raise the constitutional argument he now

- 7 -

raises on appeal. Accordingly, Defendant did not preserve this issue for our review.

## B. Ineffective Assistance of Counsel

Defendant next contends that he was denied his constitutional right to effective assistance of counsel when the trial court prohibited defense counsel from presenting diminished capacity and insanity defenses.

The Sixth Amendment to the Constitution guarantees criminal defendants the right to effective assistance of counsel. *State v. Braswell*, 312 N.C. 553, 561 (1985). To bring a successful ineffective assistance of counsel claim, a defendant must satisfy a two-part test. *Id.* at 562. "First, the defendant must show that counsel's performance was deficient." *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

Here, Defendant has failed to allege much less show that counsel's performance was deficient, as required by the first prong of the *Strickland* test. Instead, Defendant alleges that the *trial court* erred by failing to allow defense counsel to present diminished capacity and insanity defenses. Because Defendant has failed to "show[] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *id.*,

Defendant has failed to articulate an ineffective assistance of counsel claim. We thus reject his argument.

## C. Competency

Defendant next makes two arguments regarding his competency to stand trial. First, Defendant argues that the trial court erred by adopting a forensic psychiatrist's evaluation of Defendant at a 22 May 2023 competency hearing. Second, Defendant argues that the trial court should have conducted a competency hearing sua sponte at the beginning of trial.

"[T]he conviction of an accused person while he is legally incompetent violates due process[.]" *State v. Coley*, 193 N.C. App. 458, 461 (2008) (quoting *State v. Taylor*, 298 N.C. 405, 410 (1979) and citing *Pate v. Robinson*, 383 U.S. 375, 378 (1966)); *see* N.C. Gen. Stat. § 15A-1001(a) (2024). The test for competency is "whether a defendant has capacity to comprehend his position, to understand the nature of the proceedings against him, to conduct his defense in a rational manner and to cooperate with his counsel." *Coley*, 193 N.C. App. at 463 (quoting *State v. Jackson*, 302 N.C. 101, 104 (1981)).

"Evidence that a defendant suffers from mental illness is not dispositive on the issue of competency." *Id.* at 463 (quotation marks and citation omitted). "[A] defendant does not have to be at the highest stage of mental alertness to be competent to be tried." *State v. Shytle*, 323 N.C. 684, 689 (1989). "So long as a defendant can confer with his or her attorney so that the attorney may interpose any available

defenses for him or her, the defendant is able to assist his or her defense in a rational manner." *Id.* "It is the attorney who must make the subtle distinctions as to the trial." *Id.*

"The determination of whether a defendant is competent to stand trial rests within the trial court's discretion and the burden of persuasion falls upon the defendant." *Coley*, 193 N.C. App. at 461 (citation omitted). "The trial court's findings of fact, as well as its final determination, will be upheld on appeal if supported by the evidence." *Id.* (citation omitted).

### 1. *May 2023 Competency Determination*

Defendant argues that at the May 2023 competency hearing, the trial court erred by adopting a written Competency Report from a forensic psychiatrist who had examined Defendant and determined that Defendant was competent to stand trial. Defendant specifically argues that the competency hearing was inadequate to determine the issue of competency because the trial court adopted the competency report "wholesale" and did not make its own findings of fact or conclusions of law.

In *State v. Coley*, this Court addressed "whether the trial court can adopt [] facts as set forth in [a] psychiatric report in lieu of listing the facts in the traditional manner." *Id.* at 463. This Court held that the trial court could adopt facts as set forth in a psychiatrist's report and noted the lack of any "authority prohibiting the court from making findings of fact by incorporating a factual summary from a detailed report." *Id.* We explained that "[w]hile the better practice is to make

independent detailed findings of fact, adopting facts set forth in the report was not prejudicial in this instance." *Id.*

In this case, the Competency Report includes detailed notes on Defendant's capacity based on interviews conducted on 17 April 2023, 18 April 2023, and 11 May 2023. The Competency Report states in pertinent part:

> [Defendant] readily participated in an interview to assess his knowledge of the legal system and understanding of his legal situation. . . . He knew the date of the offense was either May 23 or 24, 2017. He was aware his charge was first degree murder, which was a felony. . . . He was aware that a Not Guilty plea would result in going to trial, and that if someone was found Guilty, they could file an appeal. He described other plea options of Not Guilty by Reason of Insanity (NGRI), Guilty, No Contest, and a Plea Bargain. He said NGRI means that "you say you did the crime but weren't in the right mind frame[.]" He was asked if this were something he would ever consider and said "Never, not going to get into that, only Not Guilty[.]" He knew his lawyer was Buzzy Gardner Jr., a court appointed public defender, who he stated was "a good dude[.]" . . .
>
> . . . .
>
> . . . [Defendant] was asked generally about the charge of first-degree murder, and said that if someone was found guilty, they could be sentenced to death or life in prison. . . . He was aware that if someone was found NGRI their charges would be dismissed, and they would go to a hospital until they regain their "capacity to proceed in life[.]" . . .
>
> . . . .
>
> . . . [Defendant] had spoken with his attorney over the phone the week before and reviewed written discovery material in his capacity restoration session.
>
> . . . .

> While [Defendant] does have a diagnosis of serious mental illness (schizophrenia), his symptoms are currently well managed with medications and do not impair his ability to understand the nature of the charges against him or work with his attorney in a reasonable and rational way. He has a good understanding of courtroom procedure and personnel.

Defendant stipulated to the admission of the Competency Report and offered no evidence or argument to contradict the findings in the report. The trial court adopted the Competency Report and made its own conclusion on the record that "[Defendant] has the capacity to proceed at this time."

The trial court is not prohibited "from making findings of fact by incorporating a factual summary from a detailed report." *Id.* at 463. "While the better practice is to make independent detailed findings of fact, adopting facts set forth in the report was not prejudicial in this instance." *Id.* (citation omitted).

As the Competency Report's detailed notes support the trial court's conclusion that Defendant had the capacity to comprehend his position, understand the nature of the proceedings against him, conduct his defense in a rational manner, and cooperate with his counsel, the record evidence supports the trial court's conclusion that Defendant was competent at the time of the May 2023 competency hearing. *See id.* Accordingly, the trial court did not err by adopting the Competency Report and concluding that Defendant had the capacity to proceed.

## 2. *Sua Sponte Competency Hearing*

Defendant next argues that the trial court erred by failing to conduct a

competency hearing sua sponte at the beginning of trial on 29 January 2024. Specifically, Defendant argues that his history of mental illness was sufficient evidence to require the trial court to conduct a competency hearing sua sponte at the beginning of trial.

"A trial court has a constitutional duty to institute, *sua sponte*, a competency hearing if there is substantial evidence before the court indicating that the accused may be mentally incompetent." *State v. Young*, 291 N.C. 562, 568 (1977) (emphasis and citation omitted). In other words, a trial judge is only required to hold a sua sponte competency hearing "when there is *bona fide* doubt as to the defendant's competency." *State v. Staten*, 172 N.C. App. 673, 678 (2005) (quotation marks and citation omitted). "However, where, as here, the defendant has been committed and examined relevant to his capacity to proceed, and all evidence before the court indicates that he has that capacity, he is not denied due process by the failure of the trial judge to hold a hearing subsequent to the commitment proceedings." *Young*, 291 N.C. at 568 (citations omitted).

In *Staten*, the trial court was not required to conduct a competency hearing sua sponte. 172 N.C. App. at 684. There, we found there was no evidence indicating the defendant was incapable to proceed where his replies during a colloquy were "lucid and responsive," and he "exhibited proper courtroom decorum and a desire to cooperate in the process" throughout the trial. *Id.* at 680, 683.

Here, Defendant's incapacity stemmed from his inability to consistently take

his medication in jail. To ensure he consistently took his medication and remained competent to stand trial, Defendant remained in the hospital, rather than jail, between the time of his competency hearing and his trial.

Like in *Staten*, Defendant's answers during a colloquy were lucid and responsive. When asked if he had any questions about his right to testify, Defendant first inquired about the meaning of the word testify because he was "not familiar with that terminology," then Defendant stated that he would "opt out of [testifying]." At no time during his trial did Defendant act in a way that indicated incompetency.

Defendant had been previously examined and found competent. No evidence before the trial court suggested incompetency. Thus, there was not a bona fide doubt as to Defendant's competency and the trial court was not required to hold a sua sponte competency hearing at the beginning of Defendant's trial.

## D. Rule 901 Evidence Issue

Defendant next argues that the trial court erred by admitting the voicemail recording of him and his mother into evidence. Specifically, Defendant argues that the recording was not properly authenticated under North Carolina Rule of Evidence 901 because Defendant's sister, who originally received the voicemail, testified that she remembered the voicemail being longer than the twenty-second recording entered into evidence. This argument lacks merit.

"We review de novo rulings on authentication issues under Rule of Evidence 901." *State v. Jones*, 288 N.C. App. 175, 187 (2023) (citation and italics omitted).

Under Rule 901, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." N.C. Gen. Stat. § 8C-1, Rule 901(a) (2024). Various means may be used to authenticate evidence, including "[i]dentification of a voice . . . by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." *Id.* § 8C-1, Rule 901(b)(5). "[I]t is not error under Rule 901 for a trial court to admit evidence so long as it can reasonably determine that there was sufficient evidence to support a finding that the matter in question is what its proponent claims." *State v. Joyner*, 917 S.E.2d 297, 304 (2025) (quotation marks and citation omitted).

In *State v. Stager*, a recording was properly authenticated where four witnesses identified the voice on the recording as belonging to who the State claimed it did, even though other witnesses testified to the contrary. 329 N.C. 278, 317 (1991). There, the Court stated that, "[u]nder Rule 901, testimony as to accuracy based on personal knowledge is all that is required to authenticate a tape recording, and a recording so authenticated is admissible if it was legally obtained and contains otherwise competent evidence." *Id.* The Court further stated that "[t]he conflict in the evidence goes to the weight and credibility of the evidence not its admissibility." *Id.*

Defendant argues that under *State v. Lynch*, 279 N.C. 1, 17 (1971), authentication of a recording requires the proponent to show "that the recording was

complete and had not been altered." However, the seven-prong test for authentication articulated in *Lynch* is no longer good law, as it was superseded by Rule 901. *Stager*, 329 N.C. at 317.

Here, Defendant's sister testified that she received a voicemail from her mother's phone number on 24 May 2017 while at school and "listened to the voicemail as [she] was sitting in class[.]" She "recognized [her] mother Geraldine and [Defendant's] voice in the voicemail" based on personal knowledge. She listened to the same voicemail the morning before she testified. Although she "recall[ed] the message being longer," she believed it was accurate.

Additionally, the State's forensic data analyst testified as to the process for extraction of data from Defendant's sister's phone. The State also introduced an excerpt from the data extraction report that showed that the voicemail in question was the same length as the one admitted by the trial court.

The testimony in this case was sufficient to authenticate the voicemail under Rule 901. And any conflicting evidence regarding its completeness "goes to the weight and credibility of the evidence not its admissibility." *Id.*

### III. Conclusion

For the reasons stated above, Defendant received a fair trial free of error.

NO ERROR.

Judges STROUD and GRIFFIN concur.